UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| DANNIE GIBBS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DEERE & COMPANY, )<br>)<br>Defendant. ) | Case No. 4:19-cv-04163-SLD-JEH |

ORDER

From October 2009 to September 2017, Plaintiff Dannie Gibbs was on leave from his job as an electrician with Defendant Deere & Company ("Deere"). He received short-term disability benefits for the first year of his leave and long-term disability benefits for the remaining seven years. Shortly before his long-term disability benefits were set to expire, he sought to return to his position. His own medical providers cleared him to work, but after being examined by Deere's doctor and completing a functional capacity examination, Gibbs was asked to undergo an independent medical examination. He did not do so, and Deere never returned him to his position. Gibbs claims his disability benefits were underpaid and that the failure to return him to work was race discrimination. Before the Court are Deere's Motion for Summary Judgment, ECF No. 30, and Gibbs's Motion to Strike, ECF No. 33-2. Because Gibbs's underpayment claim is barred by the doctrine of laches and there is insufficient evidence of race discrimination in the record, Deere's Motion for Summary Judgment is GRANTED, and because the Court does not rely on the materials Gibbs seeks to strike from consideration, the Motion to Strike is MOOT.

# BACKGROUND[1]

Gibbs, an African American man, began working as an electrician at Deere's Harvester Works facility in 2001. He was covered under a disability benefit plan (the "Plan") offered by Deere. Under the Plan, employees who become totally disabled are eligible to receive weekly indemnity ("WI") payments for up to 52 weeks per period of disability. If an employee remains totally disabled after exhausting WI benefits, the employee is transferred to long term disability ("LTD") benefits. The amount of WI and LTD benefits are based on an earnings bracket calculated at the start of the period of disability.

On May 21, 2009, Gibbs sustained a non-work-related back injury. On May 27, 2009, he requested WI benefits. He was on disability leave receiving $461 a week in WI benefits through July 27, 2009. At some point in or around early October 2009, he went on disability leave again and again received $461 weekly in WI benefits. Gibbs never appealed the calculation of or brought a grievance related to the amount of his WI benefits.

In a letter dated September 17, 2010, Deere notified Gibbs that his WI benefits would end on October 6, 2010, and that he would be transitioned to LTD effective October 7, 2010. Gibbs received $1,800 per month in LTD benefits for approximately seven years. He never appealed the calculation of or brought a grievance related to the amount of his LTD payments.

Gibbs sought to return to work in September 2017 "[b]ecause [he] felt that [he] could go back and do [his] job without restrictions." Pl.'s Dep. Tr. Excerpts 83:20–23, Jastromb Decl. Ex. 1, ECF No. 30-2. Deere employees who seek to return to work must submit certification of their

---

[1] On a motion for summary judgment, a court must construe the record in the light most favorable to the non-moving party. *See Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019). Unless otherwise noted, the background section is drawn from Deere's statement of undisputed material facts, Mot. Summ. J. 2–14; Gibbs's response to Deere's statement of undisputed facts and statement of additional material facts, Mem. Supp. Resp. Mot. Summ. J. 2–10, ECF No. 33-1; Deere's reply to Gibbs's response and additional facts, Reply 1–4, ECF No. 35; and the exhibits to the filings.

ability to work from their medical providers. Deere reviews that information to determine if anything else "needs to be accomplished for the employee to return." Davis Dep. Tr. Excerpts 24:2–5, Jastromb Decl. Ex. 5, ECF No. 30-3 at 43–59. Deere can require an employee to be examined by its on-site medical provider and can also "ask for further clarification on restrictions or anything that's not clarified and clear." *Id.* at 30:19–21. Employees who have been cleared to work by their medical providers and seen by Deere's on-site provider are not automatically returned to work. Depending on the circumstances, facility leadership, along with medical providers, may determine that additional information is necessary.

When Gibbs sought to return to work, he submitted a note from his doctor which stated that he had degenerative disc disease but was able to work without restrictions. On September 13, 2017, he was examined by Dr. Ritter, Deere's Occupational Health Services provider. Dr. Ritter recommended that Gibbs complete a functional capacity evaluation. Six days later, Gibbs participated in a functional capacity evaluation at Rock Valley Physical Therapy. But he would not lift more than fifty pounds during the evaluation because he believed his job did not require the ability to lift more than fifty pounds.[2] The results of the functional capacity evaluation were deemed invalid because Gibbs "was capable of greater weight in lifting and carrying tasks" than he demonstrated in the evaluation. Functional Capacity Evaluation 2, Jastromb Decl. Ex. 7, ECF No. 30-4 at 1–9.[3]

---

[2] Deere relies in part on the written report of the functional capacity evaluation for this fact. *See* Mot. Summ. J. 9 (citing Functional Capacity Evaluation 2, Jastromb Decl. Ex. 7, ECF No. 30-4 at 1–9). Gibbs objects to the Court's consideration of the report. *See* Mem. Supp. Resp. Mot. Summ. J. 6. But Deere also relied on Gibbs's deposition testimony to support the fact. Mot. Summ. J. 9. Gibbs testified that he "did not lift to 50 pounds . . . . [b]ecause [he] felt that that was way beyond the weight limit" to which Deere and the union had agreed, Pl.'s Dep. Tr. Excerpts 133:9–17, and Gibbs's deposition testimony is admissible as a statement of a party opponent, *see* Fed. R. Evid. 801(d)(2)(A). Accordingly, the Court finds the fact undisputed.

[3] Gibbs does not technically respond to this fact in Deere's motion. *See* Mem. Supp. Resp. Mot. Summ. J. 6 (responding to the first two sentences of Deere's paragraph number forty but not the third). The Court would be justified in deeming the fact admitted due to Gibbs's failure to respond. *See* Civil LR 7.1(D)(2). It appears, however, that Gibbs's response to the second sentence—objecting that the sentence is based on hearsay and Deere

Deere then asked Gibbs to complete an independent medical examination. Gibbs testified at his deposition that he knew Deere wanted him to get another evaluation or examination. *See* Pl.'s Dep. Tr. Excerpts 86:7–19; *id.* at 89:25–90:9.[4] However, he neither completed the examination nor followed up with Deere on scheduling the examination.

Gibbs filed a *pro se* complaint in this Court on August 20, 2019. Compl., ECF No. 1. After retaining counsel, he filed a two-count amended complaint. Am. Compl., ECF No. 25. In the first count, Gibbs alleges that Deere violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–461, by underpaying his WI and LTD benefits from October 2009 through September 2017. *See* Am. Compl. 3–5.[5] In the second count, Gibbs alleges that Deere discriminated against him on the basis of race in violation of 42 U.S.C. § 1981 by refusing to return him to work. *See* Am. Compl. 5–7. Deere seeks summary judgment on both counts of the amended complaint. Mot. Summ. J. 1–2. In addition to responding to Deere's summary judgment motion, Mem. Supp. Resp. Mot. Summ. J., ECF No. 33-1, Gibbs moves to strike certain evidence that Deere relies on in its motion, Mot. Strike ¶¶ 2–3.

---

"fail[ed] to disclose . . . the name and qualifications of the person who conducted the functional capacity evaluation as an expert witness," Mem. Supp. Resp. Mot. Summ. J. 6—was intended to be an objection to the sentence that the results of the functional capacity evaluation were deemed invalid. But Deere is not offering the functional capacity evaluation to show that the results were actually invalid—rather, it is offering the functional capacity evaluation to show that it was told the results were invalid. In other words, the relevance of the evaluation is that Deere decisionmakers were told that the functional capacity evaluation was invalid. As such, the statement is not hearsay, *see* Fed. R. Evid. 801(c)(2) (providing that hearsay is a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement"), and it is not an opinion for which expert testimony is necessary.

[4] Gibbs denies this, Mem. Supp. Resp. Mot. Summ. J. 6, by citing to another part of his deposition where he was asked whether it was his "understanding that [he] would need to see another doctor in order to return from leave," Pl.'s Dep. Tr. Excerpts 90:10–12. After previously confirming multiple times that he did understand that Deere was requesting that he see another doctor, *see id.* at 86:7–19, 89:25–90:9, Gibbs responded: "Well, no. . . . It's not an understanding. I mean, how am I to know that after I see this doctor and if John Deere doesn't hear what they want to hear, that there's going to be another doctor? So, no, I didn't . . . know what was going to happen." *Id.* at 90:13–19. This statement does not create a genuine dispute of fact. Gibbs was not denying that he was aware that Deere was requesting he obtain another medical evaluation. Indeed, immediately after this answer, he was asked again, "But it was your understanding at the time that the company was requesting you see another doctor in order to return from leave?" to which he responded, "That was my understanding." *Id.* at 90:25–91:3.

[5] While Gibbs also alleged that Deere violated ERISA by failing to pay him LTD benefits between October 1, 2017 and September 31, 2018, *see* Am. Compl. 4, he abandons that allegation at summary judgment, Mem. Supp. Resp. Mot. Summ. J. 13–14. Deere is accordingly entitled to summary judgment on this portion of the ERISA claim.

## DISCUSSION

I. **Motion to Strike**

Gibbs moves to strike the declaration of Attorney Emily T. Jastromb[6] because she was not disclosed as a witness; exhibits 12 through 17 attached to Jastromb's declaration because they were not produced in discovery; and references to and statements by a Dr. Deeter because Deere "failed to disclose this person as a witness" and Gibbs neither met with nor was examined by this doctor. *Id.*

In her declaration, Jastromb identifies the exhibits relied upon in the Motion for Summary Judgment and attests that the non-transcript exhibits are "true and correct cop[ies]" of what they purport to be. *See* Jastromb Decl. ¶¶ 4–19, ECF No. 30-1. Deere argues that Federal Rule of Civil Procedure 26(a), which requires disclosure of witnesses, "does not require disclosure of an attorney authenticating documents for purposes of summary judgment." Resp. Mot. Strike 4, ECF No. 36. Because Gibbs is not challenging the authenticity of the documents—and indeed relies on many of the documents himself—the Court finds it unnecessary to rule on the request to strike the entirety of Jastromb's declaration.

Jastromb further attests that she accessed and took screenshots of certain websites, which are attached to the declaration as exhibits. *See* Jastromb Decl. ¶¶ 15–19; Jastromb Decl. Exs. 12–17, ECF Nos. 30-5–30-6. The Court also finds it unnecessary to rule on the request to strike these exhibits because it does not rely on them. The Court does not reach the question of mitigation of damages, the only issue to which those exhibits are relevant.

---

[6] Jastromb served as counsel of record for Deere in this suit between January 2020, Not. Appearance, ECF No. 10, and August 2021 when she withdrew, *see* Aug. 25, 2021 Text Order.

Similarly, the Court finds it unnecessary to rule on the request to strike statements by or references to a Dr. Deeter because it does not rely on them. The Court can rule on the summary judgment motion without the one document which includes a reference to Dr. Deeter.

Because it is unnecessary to rule on any of the requests in the motion to strike, the motion is MOOT.

## II. Motion for Summary Judgment

### A. Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of showing the absence of genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant shows an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant, which must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. The nonmoving party must "cit[e] to particular parts of materials in the record, including depositions, documents, [and] . . . affidavits or declarations" or show "that the materials cited do not establish the absence or presence of a genuine dispute." *See* Fed R. Civ. P. 56(c)(1). When the record, taken as a whole, could not lead a rational trier of

6

fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party, not weigh the evidence or assess its credibility, and draw all justifiable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. However, it is not a court's task to scour motion papers in search of a genuine issue of material fact. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 898 (7th Cir. 2018) ("[J]udges are not like pigs, hunting for truffles buried in the record." (quotation marks omitted)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

B. Analysis

i. ERISA Claim

Gibbs alleges that Deere underpaid his WI benefits between October 2009 and October 2010 and his LTD benefits from then until September 2017. *See* Am. Compl. 3–4. Deere argues that it is entitled to summary judgment on this claim because Gibbs failed to exhaust his administrative remedies and because the claim is barred by the doctrine of laches. Mot. Summ. J. 1–2. The Court finds it necessary to address laches only.

"Laches is an equitable defense applicable to claims under ERISA." *Day v. Wall*, 112 F. Supp. 2d 833, 839 (E.D. Wis. 2000) (citing *Bennett v. Tucker*, 827 F.2d 63, 68 (7th Cir. 1987)). "Essentially the equitable substitute for a statute of limitations, laches serves to protect defendants from prejudice caused by stale evidence, prolonged uncertainty about legal rights and status, and unlimited exposure to liability damages." *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003). "[L]aches bars an action when the plaintiff's delay in filing the claim (1) is

unreasonable and inexcusable, and (2) materially prejudices the defendant." *Id.* It is appropriate to enter summary judgment on a laches defense when "the facts necessary for determining whether the defendant suffered material prejudice are not genuinely disputed." *Id.*

### 1. Unreasonable and Inexcusable Delay

Deere argues that Gibbs knew about his alleged underpayment "for more than a decade" and that "[h]is decade-long delay in filing is the epitome of unreasonable and inexcusable." Mot. Summ. J. 19. Gibbs does not respond to this argument. *See* Mem. Supp. Resp. Mot. Summ. J. 12–13 (addressing only Deere's prejudice argument).

The Court agrees with Deere. Gibbs is complaining about the amount of WI benefits he received starting in October 2009 and the amount of LTD benefits he received starting in October 2010. Yet he failed to file suit regarding these amounts until August 2019, nearly nine and ten years after first receiving these benefits. Importantly, the benefit amounts were determined by reference to his earnings bracket, which would have been determined based on his earnings from April, May, and June 2009. *See* Disability Benefit Plan Art. III, § 1(A), Pl.'s Dep. Ex. 8, ECF No. 30-2 at 76–100. Gibbs would have had all the information he needed to challenge his earnings bracket when it was determined in October 2009. His unexplained nearly decade-long delay in filing suit is unreasonable and inexcusable. *See Maher v. City of Chicago*, 547 F.3d 817, 822 (7th Cir. 2008) ("Simply put, the eleven-year delay between his withdrawing the DOL complaint in 1992 and filing suit in 2003 provided ample grounds for the magistrate judge to conclude that the delay was unreasonable."); *Pruitt v. City of Chicago*, 472 F.3d 925, 928 (7th Cir. 2006) ("The district court found both unreasonable delay and prejudice; it is hard to fault either conclusion. If what plaintiffs say about Jason is true, they had ample basis for suit 10, 15, or 20 years ago."); *see also Samaritan Health Ctr. v. Simplicity Health Care Plan*, 516 F.

Supp. 2d 939, 946 (E.D. Wis. 2007) ("If there is *no* reason there can be no *good* reason for the delay.").

### 2.  Material Prejudice

Deere argues that "Gibbs'[s] prolonged inaction has . . . materially prejudiced [its] ability to defend itself at trial because it has not been able to produce a witness who was involved in calculating the earnings bracket that determined Gibbs'[s] WI benefit in 2009, and thus his LTD benefit in 2010" and has no record of how Gibbs's earnings bracket was determined.  Mot. Summ. J. 19.  Gibbs argues that Deere "has not submitted evidence that" his delay in filing "caused prejudice," specifically faulting Deere for not attempting to contact a witness, Linda McManus, who he argues lives within the jurisdiction of the Court in Milan, Illinois, or "show[ing] the [C]ourt that she is unavailable or has [a] faded memory."  Mem. Supp. Resp. Mot. Summ. J. 12.  Gibbs also argues that because he has produced his earnings record from the relevant period, Deere "has failed to show that there are missing documents which prevent it from being able to show that the WI and [LTD] benefits it paid . . . were correct." *Id.* at 13 (citing Earnings Statement, Mem. Supp. Resp. Mot. Summ. J. Ex. B, ECF No. 33-1 at 22–41).

"[I]n general the decision to apply the doctrine of laches lies on a sliding scale: the longer the plaintiff delays in filing her claim, the less prejudice the defendant must show in order to defend on laches." *Smith*, 338 F.3d at 734.  Because Gibbs delayed suit for almost a decade, Deere "need not present a mountain of evidence establishing prejudice in order to succeed on its laches defense." *Id.* (applying that principle in a case where the plaintiff delayed filing suit for eight and one-half years).  The Court finds that Deere has shown enough evidence establishing prejudice to bar Gibbs's suit.

9

First, Deere has produced evidence that it no longer has any records of who determined Gibbs's earning bracket, which in turn determined the amount of his WI and LTD benefits. *See* Reply 6, ECF No. 35. Deere stated in its response to Gibbs's interrogatories that it could not "specifically identify the individuals who determined the amount of [Gibbs's] benefits with certainty, as more than ten years have passed since the events identified in th[e] [i]nterrogatory." Def.'s Objs. & Answers to Pl.'s Interrogs. 4, Jastromb Decl. Ex. 10, ECF No. 30-4 at 20–30. That it cannot identify a witness who could testify regarding the events at issue to this claim materially prejudices Deere's ability to put on a defense at trial.

Gibbs argues that McManus was involved in determining his benefits, Mem. Supp. Resp. Mot. Summ. J. 8, 12–13, and Deere should have attempted to contact her and proved either that she was unavailable or that her memory had faded, *see id.* at 12–13. But Deere did not argue that McManus's memory had faded, so it need not have provided evidence to prove that. Rather, it argues that it lost contact with her because she retired in 2014 and the most recent confirmation Deere had as to her address was from 2011. *See* Mot. Summ. J. 20; Davis Decl. ¶ 10, ECF No. 30-7 (indicating that "[a]s of September 9, 2011, Deere's records indicate that Ms. McManus lived in Milan, Illinois" and "[t]here is no more recent contact information for Ms. McManus"). A defendant is not required "to prove the absolute unavailability of key witnesses as a prerequisite for laches." *Smith*, 338 F.3d at 734.[7]

Second, Deere has demonstrated that it has no record of "the precise figures or rationale used" to calculate Gibbs's earnings bracket. Mot. Summ. J. 19. Amber Davis, Deere's current

---

[7] Even if Deere should have determined whether the address it had for McManus—which is in the Court's subpoena jurisdiction—was still valid, this does not undermine its showing of prejudice. Gibbs is basing his argument that McManus was involved in determining his WI and LTD benefits on one email McManus sent in 2010 regarding his WI hours. *See* Sept. 15, 2010 McManus Email, Mem. Supp. Resp. Mot. Summ. J. Ex. E, ECF No. 33-1 at 97. WI hours are not necessarily the same thing as WI benefit amounts, and, moreover, any involvement in 2010 does not necessarily establish that McManus was involved in determining Gibbs's earnings bracket in 2009. It is thus speculative whether McManus is even a key witness.

Disability Benefits Administrator, testified at her deposition that she did not begin working for Deere until 2011, Davis Dep. Tr. Excerpts 5:21–23, Jastromb Decl. Ex. 5, ECF No. 30-3 at 43–59, and, accordingly, was not involved in calculating Gibbs's benefits, *id.* at 20:21–21:3, and did not know how the Plan was enforced in 2009 and 2010, *id.* at 22:8–15. She also provided a declaration indicating that Deere has produced all the records in its custody that relate to the determination of Gibbs's WI and LTD benefits in 2009 and 2010 and that a request for archived records did not return any new records related to those determinations. Davis Decl. ¶ 8. Certainly, the passage of nearly ten years contributed to the unavailability of critical records. *See Smith*, 338 F.3d at 735 ("[T]he passage of so many years due to Smith's delay in bringing charges undoubtedly contributed to the unavailability of critical physical evidence [including employee records]."); *Pruitt*, 472 F.3d at 928 (finding that the defendant had shown prejudice for laches in part because "documents that would have confirmed (or refuted) plaintiffs' assertions that they complained within the bureaucracy [we]re no longer in existence"). Gibbs's argument that the earnings statement he provided is sufficient to litigate the claim is not persuasive to the Court; as Deere argues, it should not be required to defend itself without the benefit of its own records and on Gibbs's evidence alone. *See* Reply 6.[8]

---

[8] Indeed, the record does not straightforwardly prove Gibbs's claim. According to the Plan, for benefit claims commencing in October, the benefit amount is determined by reference to "[t]he individual employee's . . . average straight-time hourly earnings as of the first day of . . . July." Disability Benefit Plan Art. III, § 1(A). The Plan provides for the following calculation of average straight-time hourly earnings: "Divide the sum of all money paid during the three (3) calendar months preceding [the first of July] for hours worked, excluding overtime penalty pay, by the total of such hours worked." *Id.* The Plan provides an amount of WI benefits and LTD benefits for different earnings brackets, or ranges of average straight-time hourly earnings. *Id.* Art. III, § 2(A). In the amended complaint, Gibbs alleges "[t]hat from April 1, 2009 through June 30, 2009[, his] average straight time hourly earnings . . . was 23.88" and that this entitled him to WI benefits of $509 and a long-term disability benefit of $2,000. Am. Compl. 3. In his answers to Deere's interrogatories, he stated that "[f]rom April 1, 2009 through June 30, 2009 [he] worked a total of 333 hours" and "earned in straight time hours $7,951.84." Pl.'s Answers Interrogs. 2, Jastromb Decl. Ex. 11, ECF No. 30-4 at 31–40. But he does not explain how he arrived at those numbers or how the earnings statement he provided supports them. In any case, the earnings statement leaves many questions unanswered. First, the paychecks represented on the earnings statement do not precisely cover the full calendar months of April, May, and June, *see* Earnings Statement 5, 8, ECF No. 33-1 at 26, 29, which is the relevant time period under the Plan. *See* Disability Benefit Plan Art. III, § 1(A). The first paycheck in April, for example,

Deere has provided sufficient evidence, which is not genuinely disputed, that it was materially prejudiced by Gibbs's unreasonable and inexcusable delay in filing suit regarding his allegedly underpaid benefits. Gibbs's ERISA claim is therefore barred by the doctrine of laches, and Deere is entitled to summary judgment on this claim.

### ii. Section 1981 Claim

"Section 1981 guarantees equal rights to all citizens regardless of race and in the context of employment provides that all people have the 'same right . . . to make and enforce contracts.'" *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) (alteration in original) (quoting 42 U.S.C § 1981(a)). To prevail on a § 1981 claim, a plaintiff "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Assoc. of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). The key question on a motion for summary judgment in a § 1981 employment discrimination case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the . . . adverse employment action." *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Deere argues that it is entitled to summary judgment on Gibbs's § 1981 claim because he "cannot show he was subject[ed] to an adverse action when he failed to complete an [independent medical examination] to return to work" and even if he had been subjected to an adverse employment action, "he has not met his burden to show that his race caused that action." Mot. Summ. J. 23–27. Deere also argues that Gibbs's "failure to mitigate his damages bars

---

presumably included two days from March. Earnings Statement 5, ECF No. 33-1 at 26 (indicating the prior pay period ended March 29, 2009). It may not be possible to discern from the earnings statement how much Gibbs actually earned in those three months. Moreover, the calculation is supposed to be based on "all money *paid* . . . for hours worked," Disability Benefit Plan Art. III, § 1(A) (emphasis added), but Gibbs's calculation seems to be based on gross earnings, not money actually paid to him. And if it is relevant when the money was paid, the earnings statement does not indicate when the checks were actually paid, only the pay period end date.

recovery of any economic damages." *Id.* at 27–29.  Gibbs argues that he was subjected to an actionable adverse action and that he has established both a *prima facie* case of discrimination under the *McDonnell Douglas* burden shifting framework and that Deere's reason for not returning him to work—that he failed to complete the independent medical examination—was pretext for discrimination.  *See* Mem. Supp. Resp. Mot. Summ. J. 14–17.  It is not clear whether Gibbs is alleging that requiring him to submit to an independent medical examination or failing to return him to work was the adverse employment action.  *Compare id.* at 14 ("Dan . . . was denied the right to return to work."), *and id.* at 16 ("He was subject to an adverse employment action he [sic] was not returned to work . . . ."), *with id.* at 15 (arguing that "the requirement of an independent medical examination could constitute an adverse action").  Regardless, the Court finds that Gibbs has not provided enough evidence for a reasonable factfinder to conclude that his race caused either action.

### 1. *McDonnell Douglas*

"One way of proving employment discrimination . . . remains the burden-shifting framework" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation marks omitted).[9]  Under this framework, a plaintiff must show evidence of the following: "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected

---

[9] While *Logan* concerns claims under Title VII, *see Logan*, 4 F.4th at 532, courts "generally apply the same standards to Title VII and [§] 1981 race discrimination claims at the summary judgment stage," *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013).  Although the causation required to prove Title VII and § 1981 claims differs, *Comcast*, 140 S. Ct. at 1017–19, the Seventh Circuit has found that other discrimination statutes with but-for causation requirements, for example the Age Discrimination in Employment Act, are subject to "similar analytical approaches—*McDonell* [sic] *Douglas* and *Ortiz*—at summary judgment" as Title VII.  *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021).  Therefore, the Court finds it appropriate to cite to Title VII cases.

class were treated more favorably." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (quotation marks omitted). If a plaintiff satisfies each of these elements, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (quotation marks omitted).

Gibbs argues he has established each element of his *prima facie* case: first, he is African American; second, he was meeting Deere's expectations "since he was not subject to any discipline during the time prior to him taking disability leave"; third, "[h]e was subject[ed] to an adverse employment action [as] he was not returned to work after having provided a full release from his physician and having passed Dr. Ritter's in house physician examination"; and fourth, "there were other similarly situated non-African Americans who had been returned to work after having been released by their physicians and passing an in house physical by Deere's company doctor." Mem. Supp. Resp. Mot. Summ. J. 16.

But Gibbs's only evidence for the fourth element of the *prima facie* case is his own statement that during the time he worked at Deere's Harvester Works facility, he observed "ten employees, none of whom were African American[,] who between October 2001 and October 2009 . . . returned to their jobs after being released by their doctor and having undergone a company physical." Gibbs Aff. ¶ 9, Mem. Supp. Resp. Mot. Summ. J. Ex. D, ECF No. 33-1 at 44–46. "[W]hether employees are similarly situated is a flexible, common-sense, and factual inquiry." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (quotation marks omitted). In making that determination, the court considers various factors like whether the employees had the same job description and the same supervisor and whether the employees were similarly qualified. *Id*. at 226. If sufficient information is not provided, the

14

court cannot find employees to be comparable. *See Anders v. Waste Mgmt. of Wis., Inc.*, 463 F.3d 670, 676–77 (7th Cir. 2006). Here, the record lacks any information regarding the specifics about the ten employees' jobs, their disabilities, or the outcome of their company physicals, so the Court cannot find these employees similarly situated to Gibbs. *See id.* (affirming a grant of summary judgment on a race discrimination claim where, while the employee claimed "that there were four white, comparable . . . employees who engaged in analogous acts of aggression, the record [wa]s devoid of any information as to the specifics of their actions, their supervisor, or any mitigating circumstances"). Gibbs has not met his burden to establish his *prima facie* case and therefore cannot survive summary judgment under the *McDonnell Douglas* framework.

### 2. Evidence as a Whole

"[R]egardless of whether [a] court also analyzes the evidence pursuant to *McDonnell Douglas*," it must, at the summary judgment stage, "consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of" his protected characteristic. *See Tyburski*, 964 F.3d at 598 (quotation marks and emphasis omitted). The court may consider direct and circumstantial evidence without differentiation. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). Examples of circumstantial evidence that may "support an inference of intentional discrimination [include] ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).

Gibbs fails to provide any evidence from which a reasonable jury could find that he was subjected to an adverse action because of his race. None of the evidence he points to, whether considered by itself or together, supports an inference of race discrimination. First, he argues

that "Deere's argument that [he] needed to undergo an independent medical examination is not supported by any witness," so "the requirement that [he] undergo an independent medical examination in order to return to work is pretext and is evidence of disparate treatment." Mem. Supp. Resp. Mot. Summ. J. 14. But Gibbs has not created a genuine dispute of fact as to whether he was asked to undergo an independent medical examination after his functional capacity evaluation results were deemed invalid. *See supra* p. 3–4 & nn. 3–4. Moreover, pretext "is not just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020) (alteration in original) (quotation marks omitted). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason" given. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). Gibbs offers no evidence to show that the decisionmakers at Deere did not believe an independent medical examination was necessary.

Along similar lines, Gibbs argues that "Deere's claim that the results of the functional capacity evaluation test are not valid because [he] did not lift 50 pounds has been demonstrated to be false." Mem. Supp. Resp. Mot. Summ. J. 15. He argues that "Deere had adopted an ergonomic policy in 2011 which prevented its workers from lifting 50 pounds or more." *Id.* (citing John Deere Ergonomics – Design for Manufacturing 31, Gibbs Aff. Ex. 1, ECF No. 33-1 at 47–96). But the document he cites does not purport to be a statement of Deere's employment policy for all positions; rather, it is a set of design criteria for equipment, tools, products, and workstations designed by John Deere. *See* John Deere Ergonomics – Design for Manufacturing 5.

Next, Gibbs argues that Deere "has not pointed to any language in the collective bargaining agreement which allows [it] to conduct an independent medical examination of an employee returning to work from disability leave after that employee has been fully released by his own physician and has passed the in house company doctor's physical examination." Mem. Supp. Resp. Mot. Summ. J. 15. Gibbs does not explain what he means by "passed the in house company doctor's physical examination." *Id.* He does not dispute that Dr. Ritter recommended that he complete a functional capacity evaluation, which suggests that he did not, in fact, "pass" Dr. Ritter's examination. Regardless, Gibbs does not dispute that "[a]n employee who has been cleared to work by [her] health care provider and seen by Deere's on-site provider is not automatically returned to work" and that any further information that may be necessary "depends on the particular circumstances." *See* Mot. Summ. J. 8; Mem. Supp. Resp. Mot. Summ. J. 5. An independent medical examination could provide additional information necessary to clarify an employee's restrictions. Moreover, the Court fails to see why Deere must point to a specific provision of the collective bargaining agreement allowing an independent medical examination so long as there is no provision which prohibits it.[10]

Gibbs further argues that "in 2012 the company made known that they did not want him back in the plant because they were afraid that he would create a worker's compensation claim."

---

[10] Presumably this argument is in response to Deere's citation to a provision in the Plan which provides: "The Company, at its own expense, shall have the right to require an employee to submit to an examination by an independent physician designated by it for the purpose of determining continuing disability." Mot. Summ. J. 3 (citing Disability Benefit Plan Art. I, § 4). It is not clear that an independent medical examination to determine an individual's fitness to return to work (*i.e.*, whether he is no longer disabled), as opposed to his continuing eligibility for benefits (*i.e.*, whether he continues to be disabled), is contemplated under this provision. But as long as Deere's decisionmakers genuinely believed this provision allowed an independent medical examination, Gibbs cannot show pretext by showing it was a mistaken interpretation of the agreement. *See Johnson v. Soo Line R.R. Co.*, Case No. 17-cv-7828, 2022 WL 540758, at *12 (N.D. Ill. Feb. 23, 2022) ("Even if Defendant made a grave error in its interpretation of Section 27, that fact alone does not suggest that Defendant's termination process was used to hide racial discrimination. Plaintiff has presented no evidence indicating that Defendant did not honestly believe that Plaintiff had violated Section 27(e)." (quotation marks omitted)).

Mem. Supp. Resp. Mot. Summ. J. 16.  He argues he "can point to this fact to show that the reason for Deere not returning him to work is pretext for discrimination and constitutes race discrimination in employment." *Id.* at 16–17.  The Court disagrees.  Even if true, the statements Gibbs is referring to were made in 2012, not around the time of the decision to require him to submit to an independent medical examination, so they are not particularly probative of the motivation for that decision.  *See Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) ("Although stray remarks are generally insufficient to establish discriminatory motivation, an exception may be made where the remark was (1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action.").  More importantly, however, the statement does not suggest that Deere's reasoning for requiring an independent medical examination was pretext for race discrimination.  Instead, it suggests that the reason he was not returned to work was a concern that he would hurt himself and cause the company to have to pay worker's compensation.  Section 1981 requires but for causation, *see Comcast*, 140 S. Ct. at 1019, so if a concern about a potential worker's compensation claim resulted in requiring Gibbs to do an independent medical examination and not returning him to work regardless of whether racial animus was present, then race was not the but for cause, *see id.* (explaining that a § 1981 plaintiff must show that "but for race, it would not have suffered the loss of a legally protected right").

      Finally, Gibbs suggests that "[i]t was not [his] job to schedule the [independent medical examination] and Deere's failure to do so demonstrates that its reasons for not returning him to work were false."  Mem. Supp. Resp. Mot. Summ. J. 16.  This is a non-starter.  The Court has no evidence about whose responsibility scheduling the appointment was: Deere's, the examiner's, or Gibbs's.  Absent any evidence that it was specifically Deere's responsibility to schedule the

appointment and that it refused to do so, any inference of pretext or race discrimination would be merely speculative.

In sum, there is simply no evidence from which a reasonable jury could find that the decision to require Gibbs to submit to an independent medical examination and the failure to return him to his position as an electrician were based on his race. Gibbs's attempts to cast doubt on Deere's reasoning fall short of showing that Deere offered false reasons for those actions, *see Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 666 (7th Cir. 2007) (affirming grant of summary judgment where the plaintiff's "evidence [wa]s insufficient to permit a reasonable jury to conclude that the[] reasons [provided for recommending against granting the plaintiff tenure] were deliberately false"), or attempted to "cover [its] tracks or hide the[] real reason" for its decisions, *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021). And even if he could show pretext, Gibbs has absolutely no evidence the real reason for the decisions was his race. *See id.* at 747 ("[A] showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." (quotation marks omitted)). The only evidence that relates to race is Gibbs's comparator evidence which is far too conclusory to create an inference of discrimination. Deere is entitled to summary judgment on this claim too.

## CONCLUSION

Accordingly, Defendant Deere & Company's Motion for Summary Judgment, ECF No. 30, is GRANTED, and Plaintiff Dannie Gibbs's Motion to Strike, ECF No. 33-2, is MOOT. The Clerk is directed to enter judgment and close the case.

Entered this 10th day of March, 2022.

s/ Sara Darrow<br>
SARA DARROW<br>
CHIEF UNITED STATES DISTRICT JUDGE